IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CITY OF CHICAGO,                      )
                                      )
              Plaintiff,              )
                                      )
        v.                            )   No. 14 C 4361
                                      )
PURDUE PHARMA L.P., *et al.*,         )
                                      )
              Defendants.             )


<u>MEMORANDUM OPINION AND ORDER</u>

Purdue Pharma L.P, Purdue Pharma, Inc., and The Purdue
Frederick Company, Inc. (collectively, "the Purdue Defendants")
have moved to disqualify Linda Singer, Esq. ("Ms. Singer") and
her current law firm, Cohen Milstein Sellers & Toll PLLC ("Cohen
Milstein"), from representing the City of Chicago in this suit.
The movants make two arguments: (1) Rule 1.11(a) of the District
of Columbia Rules of Professional Conduct prohibits Ms. Singer
from representing the City in this case because it is "the same
as, or substantially related to, a matter in which [she]
participated personally and substantially" during her tenure as
Attorney General for the District of Columbia and (2) Ms.
Singer's continued representation of the City in this action
creates an appearance of impropriety.

Neither of the Purdue Defendants' arguments is persuasive, so I deny their motion to disqualify Ms. Singer and Cohen Milstein for the reasons stated below.

I.

The following facts are undisputed unless noted otherwise. Ms. Singer served as Attorney General for the District of Columbia ("D.C. Attorney General") from January 2, 2007 to January 9, 2008.  She is currently head of the "Public Client" practice group at Cohen Milstein in Washington, D.C.

In 2004, three years before Ms. Singer's tenure as D.C. Attorney General, that office started investigating whether the Purdue Defendants' marketing of OxyContin violated the D.C. Consumer Protection Act, D.C. Code § 28-3901 *et seq*.  D.C. served on the Executive Committee of a group of twenty-seven jurisdictions investigating the Purdue Defendants' sales and marketing of opioids ("OxyContin Multistate Investigation").

The D.C. Attorney General's Office assigned one attorney, Grant Moy, Esq. ("Mr. Moy"), to work on the OxyContin Multistate Investigation.  Mr. Moy worked in the Consumer and Trade Protection Section under the direct supervision of Bennett Rushkoff, Esq. ("Mr. Rushkoff"), who served as Section Chief. Mr. Rushkoff had authority to decide whether the District would join in any settlement of the OxyContin Multistate Investigation.

2

On April 5, 2007, about three months after Ms. Singer took office as D.C. Attorney General, Mr. Moy notified Mr. Rushkoff that the Executive Committee for the OxyContin Multistate Investigation had reached a tentative $19.5 million settlement with the Purdue Defendants.  The District's share of the settlement would be $980,000.  Mr. Moy also reported that the settlement would take the form of consent judgments filed in each of the twenty-seven participating jurisdictions.

About one hour after receiving Mr. Moy's e-mail, Mr. Rushkoff forwarded it to Ms. Singer and other officials in the D.C. Attorney General's Office.  Mr. Rushkoff noted that D.C.'s share of the proposed settlement would push the Consumer Protection Fund over its statutory limit, resulting in the loss of hundreds of thousands of dollars to the District's general revenue fund.  *See* 2000 D.C. Legis. 13-172, § 1402(f) (establishing the "District of Columbia Consumer Protection Fund" as "a proprietary fund with assets not to exceed $1,490,000 at any time")

Ms. Singer called Mr. Rushkoff on April 5, 2007, after receiving his e-mail.  She instructed him to work with an attorney in the Legal Counsel Division on legislation to increase the Consumer Protection Fund's statutory cap.  Ms.

Singer also suggested the name of a D.C. Councilmember who might be receptive to pushing such legislation.[1]

One day later after learning about the settlement, Ms. Singer congratulated Mr. Moy for his work.  She described the settlement as "a huge win for the office and for consumers in the District and around the country."  Defs.' Ex. D.

On April 12, 2007, Ms. Singer was copied on an e-mail between a Deputy Attorney General in her office and a D.C. Councilmember's staffer about introducing legislation to increase the Consumer Protection Fund's statutory cap.  When the Councilmember indicated that he would support such legislation, Ms. Singer instructed her staff to prepare a draft bill and asked to see the draft before it was sent to the D.C. Council.  On April 16, 2007, after receiving draft legislation from her staff, Ms. Singer told Mr. Rushkoff she would send it to the D.C. Council if he "sign[ed] off."  Dkt. No. 139-9 at 11.  Mr. Rushkoff approved the draft legislation subject to one minor correction.  *Id*.

On May 3, 2007, Mr. Rushkoff sent Ms. Singer a follow-up memorandum about increasing the Consumer Protection Fund's statutory cap.  He reported that the District, in coordination with other states, planned to file its complaint against the

---

[1] The unique spelling of "Councilmember" used in this opinion is based on how these legislators refer to themselves.  *See* http://dccouncil.us/council (last visited Dec. 12, 2014).

Purdue Defendants in D.C. Superior Court on May 8, 2007.  Mr.
Rushkoff also informed Ms. Singer that he would ask the
Executive Committee to defer paying D.C.'s share of the
settlement if, when the money became available, the D.C. Council
was considering legislation to increase the Consumer Protection
Fund's statutory cap.  Finally, Mr. Rushkoff advised Ms. Singer
on the Consumer Protection Fund's current balance, how money in
the Fund was being used, and whether the Fund had ever been
subject to an audit.

On May 4, 2007, one day after receiving Mr. Rushkoff's
memo, Ms. Singer provided comments to him on a draft press
release regarding the upcoming settlement.  She suggested saying
more about the risks of OxyContin and its "off-label" uses.  Ms.
Singer also asked Mr. Rushkoff to add a line to her quote in the
press release to say, "in effect, that inappropriate marketing
of drugs for uses not approved by the FDA is a serious issue in
that it is dangerous to public health and diverts our public
dollars from better, safer health care uses."  Defs.' Ex. F.

Three days later, on May 7, 2007, Ms. Singer asked Mr.
Rushkoff to send the draft press release to the D.C. Mayor's
Office.  A few hours later, Mr. Rushkoff copied Ms. Singer on
his response to inquiries from the Mayor's Office about the
proposed increase in the Consumer Protection Fund's statutory
cap.  Attached to Mr. Rushkoff's e-mail were his May 3, 2007

5

memorandum to Ms. Singer; the draft complaint against the Purdue Defendants; and the proposed consent judgment.

On May 8, 2007, the District of Columbia filed suit against the Purdue Defendants in D.C. Superior Court. *See D.C. v. Purdue Pharma L.P.*, No. 2007 CA 003186 B (D.C. Sup. Ct.). Ms. Singer's name appears in the signature block of the complaint, but only Mr. Rushkoff and Mr. Moy signed it.

On the same day that the District filed suit against the Purdue Defendants, the D.C. Attorney General's Office issued a press release entitled, "Multistate Settlement Reached with Manufacturer of OxyContin." The press release contains the following quote from Ms. Singer:

> "Inappropriate marketing of drugs for uses not approved by the FDA is serious and can lead to overuse and abuse of what otherwise would be a safe and effective product. The agreement reached today will help stem the continuing illicit use of OxyContin," said General Singer. "I commend Purdue Pharma on its cooperation and willingness to work with the attorneys general to resolve issues arising from its marketing of this widely abused drug."

Defs.' Ex. B. The press release also mentioned that the District's settlement with the Purdue Defendants would be filed as a consent judgment in D.C. Superior Court.

On May 10, 2007, two days after her office issued the press release quoted above, Ms. Singer asked Mr. Rushkoff, "Have we issued our press release? Should I be making any calls?" Dkt.

No. 139-9 at 70.  There is no evidence indicating whether Ms.
Singer called any legislators or reporters about the settlement.

Two days later, on May 12, 2007, Ms. Singer e-mailed one of
the Mayor's policy advisors to ask for an update on the status
of legislation to increase the Consumer Protection Fund's
statutory cap.  She learned that the Mayor had approved such
legislation and submitted it to the Chairman of the D.C.
Council.  Mr. Rushkoff advised Ms. Singer that this action
provided the District with a "good basis" to delay receiving its
share of the settlement until the pending legislation passed.
Pl.'s Ex. 17 at 99.

On May 14, 2007, the District moved for entry of its
consent judgment against the Purdue Defendants.  The D.C.
Superior Court entered the consent judgment on May 26, 2007.
Paragraph 1.L of the judgment provides that the term "Attorney
General" shall mean "the Attorney General for the District of
Columbia, or her designee."  Ms. Singer's name appears in the
signature block of the consent judgment, but only Mr. Rushkoff
and Ms. Moy signed it, presumably as her designees.

On June 1, 2007, Ms. Singer wrote a letter to the Chair of
the D.C. Council asking him to place emergency legislation to
increase the Consumer Protection Fund's statutory cap to $3
million on the agenda for the Council's next meeting.  About two
weeks later, Ms. Singer received confirmation that such

7

legislation had been placed on the agenda for the D.C. Council's next legislative meeting.  Ms. Singer promptly forwarded this e-mail to Mr. Rushkoff.  The underlying legislation, known as the "District of Columbia Consumer Protection Fund Temporary Amendment Act of 2007," was approved on July 27, 2007 and went into effect on October 18, 2007.  *See* 2007 D.C. Legis. Serv. 17-34 (West).

The actions described above constitute the entirety of Ms. Singer's personal participation in the OxyContin Multistate Investigation and the resulting consent judgment.  There is no evidence that Ms. Singer participated in the underlying investigation or settlement negotiations.  *See* Pl.'s Ex. 7 ("Singer Declar.") at ¶ 6 ("I have no recollection of ever being briefed on or involved in the Purdue investigation or settlement."); *see also id.* at ¶ 10.  Similarly, there is no evidence that the attorneys managing the case sought--or needed to seek--Ms. Singer's approval of the settlement.  *Id.* at ¶ 7.

### II.

In November 2012, the City of Chicago ("City") entered into discussions with Ms. Singer concerning an investigation and potential lawsuit against opioid manufacturers for alleged violations of state and municipal laws.  These discussions culminated in a representation agreement between the City and Ms. Singer's law firm, Cohen Milstein, dated April 8, 2013.

8

The City, acting through Cohen Milstein, served an investigative subpoena on the Purdue Defendants on April 10, 2013.  The subpoena identified Ms. Singer as "Special Assistant Corporation Counsel" for the City.[2]  In response to this subpoena, the Purdue Defendants questioned whether Ms. Singer's involvement with the City's investigation violated the D.C. ethical rule prohibiting former government lawyers from "accept[ing] other employment in connection with a matter which is the same as, or substantially related to, a matter in which the lawyer participated personally and substantially as a public officer or employee."  D.C. R. of Prof'l Conduct 1.11(a).

In July 2013, Ms. Singer and Cohen Milstein hired a private "ethics counsel" who requested an advisory opinion from the D.C. Bar Legal Ethics Committee ("D.C. Ethics Committee") on whether Rule 1.11(a) barred them from representing the City in its investigation of the Purdue Defendants and other opioid manufacturers.  The Vice Chair of the D.C. Ethics Committee issued an advisory opinion in November 2013 answering this question in the negative, but with the following caveat: "[T]his opinion...reflects only my personal views and not those of the full Committee [and] is not binding on Bar Counsel or on any court.  Moreover, having made no independent investigation of

---

[2] In a separate motion, Defendants argue that the City unlawfully delegated its investigative subpoena powers to Cohen Milstein, a "financially interested third party."  *See* Dkt. No. 148.

the facts, I am relying exclusively on information that you have provided." Defs.' Ex. R.

Meanwhile, the Purdue Defendants hired their own ethics counsel, Earl J. Silbert of DLA Piper in Washington, D.C. In August 2013, Mr. Silbert opined that Ms. Singer's representation of the City violated Rule 1.11(a). On the key question of whether Ms. Singer "participated personally and substantially" in the OxyContin Multistate Investigation, Mr. Silbert concluded that "[t]he press release by itself establishes that [she] was so involved and informed and had control of the ultimate disposition of the litigation." Defs.' Ex. O.

In September 2013, while Ms. Singer's request for an advisory opinion from the D.C. Ethics Committee was still under advisement, the City withdrew its investigative subpoena to the Purdue Defendants. The City did not re-issue an investigative subpoena to the Purdue Defendants before filing this lawsuit.

Shortly after the City filed this lawsuit, the Purdue Defendants renewed their argument that Ms. Singer's representation of the City violated Rule 1.11(a) because of her involvement in the OxyContin Multistate Investigation. The City responded that the D.C. Attorney General's search for e-mails and other documents relating to Ms. Singer's involvement in that matter showed that she merely received notice of the settlement, participated in editing a press release, and helped increase the

10

Consumer Protection Fund's statutory cap.  The City produced all
of these documents--consisting mostly of e-mails--to the Purdue
Defendants on August 18, 2014.  The Purdue Defendants, for their
part, confirmed that they had no correspondence or other
documents showing Ms. Singer's involvement with the OxyContin
Multistate Investigation.

On August 21, 2014, the Purdue Defendants obtained an
"updated" ethics opinion from Mr. Silbert rebutting the advisory
opinion Ms. Singer had obtained from the D.C. Ethics Committee
in November 2013.  With this updated opinion in hand, the Purdue
Defendants filed the present motion to disqualify Ms. Singer and
Cohen Milstein from representing the City in this case.

III.

The City first challenges the Purdue Defendants' standing
under D.C. Rule of Professional Conduct 1.11(a) ("D.C. Rule
1.11(a)") to seek Ms. Singer's disqualification.[3]

In support of its statutory standing objection, the City
invokes "[t]he general rule...that only a current or former
client has standing to seek disqualification of an attorney from
a matter pending before a court."  *Mills v. Hausmann-McNally,
S.C.*, 992 F.Supp.2d 885, 891 (S.D. Ind. 2014).  That rule,

---

[3] Under Local Rule 83.50, Ms. Singer is bound by D.C. Rule
1.11(a) while practicing in this Court for two reasons: (1) ABA
Model Rule 1.11(a) differs from D.C. Rule 1.11(a) in terms of
when a conflict can be waived and (2) Ms. Singer's principal
office is located in the District of Columbia.

however, originates from cases determining who has standing under Model Rule 1.7 and its state equivalents to seek an attorney's disqualification based on his or her conflict of interest with a client.  The Purdue Defendants are not seeking Ms. Singer's disqualification under Rule 1.7, so the City's reliance on the "general rule" recited in *Mills* and the cases cited therein is misplaced.

The rationale behind the rule that only current and former clients may seek an attorney's disqualification under Rule 1.7 is that the rule was "designed to protect the interests of those harmed by conflicting representations rather than serve as a weapon in the arsenal of a party opponent." *Id.; see also In re Sandahl*, 980 F.2d 1118, 1121 (7th Cir. 1992) (observing that a party has no standing to assert an opponent's right to loyalty from its chosen counsel).  Applying that reasoning to the present case, the relevant question is whether the Purdue Defendants, as the former targets of a government investigation, are among the intended beneficiaries of the special conflict of interest rule set forth in D.C. Rule 1.11(a).

The parties and the Court have located only one case analyzing who may seek an attorney's disqualification for an alleged violation of Model Rule 1.11(a) or its state law analogues.  In *U.S. v. Villaspring Health Care Center, Inc.*, No. 3:11-43-DCR, 2011 WL 5330790 (E.D. Ky. Nov. 7, 2011), the court

12

held that the United States had standing to seek the disqualification of defendants' lawyer, a former Kentucky Assistant Attorney General, for violating Kentucky's version of Rule 1.11(a).  *Id.* at *4.  This holding was based on Comment 3 to Kentucky Rule 1.11(a), which notes that the rule applies "regardless of whether a lawyer is adverse to a former client." *Id.; see also* ABA Model R. 1.11(a) cmt. 3 (rule "appl[ies] regardless of whether a lawyer is adverse to a former client and are thus designed not only to protect the former client, but also to prevent a lawyer from exploiting public office for the advantage of another client).

D.C. Rule 1.11(a) does not contain commentary stating that it applies regardless of whether an attorney is adverse to her former government client.  The absence of such commentary reflects, according to the City, "a conscious decision by the drafters of the D.C. Rules to limit Rule 1.11 to protect only former government clients."  Dkt. No. 139 at 16.  However, D.C.'s highest court has taken a broader view of Rule 1.11(a)'s scope: "The prohibitions of Rule 1.11 are not limited to side-switching; they apply even if the former public employee espouses the same position in private practice as she did as a public official."  *In re White*, 11 A.3d 1226, 1249 (D.C. 2011); *see also In re Sofaer*, 728 A.2d 625, 650 (D.C. 1999) ("Rule 1.11(a) [is] a prohibition on handling overlapping matters in

13

the government and then later in private practice. Handling such overlapping matters is itself the disciplinary violation prohibited by Rule 1.11(a)."). This interpretation of D.C. Rule 1.11(a) is equivalent to the commentary upon which the *Villaspring* court relied and suggests that former government clients are not the only intended beneficiaries of the rule.

The D.C. Court of Appeals' construction of Rule 1.11(a)'s predecessor, Disciplinary Rule 9-101(B), also suggests that the target of an investigation may seek to disqualify a former government attorney:

> Courts and the bar have called it fundamentally unfair for a former government attorney, newly in private practice, to use specific information obtained by the exercise of government power--information that otherwise would not be available to his or her client--to the prejudice of opposing private party litigants. This unfairness exists even if the former client, the government, is not prejudiced by the lawyer's subsequent use of the information.
>
> Accordingly, [Rule 1.11(a)'s predecessor] may require disqualification even though in a literal sense no side-switching takes place, i.e., even though the former government attorney later takes a position for a private client wholly consistent with the position he or she took on behalf of the government.

*Brown v. Dist. of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 45 (D.C. 1984) (en banc) (internal quotation and citations omitted); *see also Kessenich v. Commodity Futures Trading Comm'n*, 684 F.2d 88, 98 (D.C. Cir. 1982) ("Public confidence in [government] procedures will be undercut if litigants must fear

14

that the public officials who handle their case may one day oppose them in regard to the same matter.").

In sum, D.C. Rule 1.11(a) applies even when a government attorney enters private practice and takes the same position against the same party that he or she took on behalf of a government client. *See In re White*, 11 A.3d at 1249.  One purpose behind this restriction is to prevent prejudice to "private party litigants" whose opponent is represented by a former government attorney. *Brown*, 486 A.2d at 45.  It follows that the Purdue Defendants, as former targets of a government investigation, are among the intended beneficiaries of D.C. Rule 1.11(a) who have standing to seek Ms. Singer's disqualification based on her alleged involvement in that matter while she served as D.C. Attorney General.

IV.

On the merits, I must decide whether Ms. Singer has (1) "accept[ed] other employment" (2) on "a matter which is the same as, or substantially related to" (3) "a matter in which [she] participated personally and substantially as a public officer or employee."  D.C. Rule 1.11(a).

"[A]ny doubt [on whether Ms. Singer has violated Rule 1.11(a)] is to be resolved in favor of disqualification."  *In re Sofaer*, 728 A.2d at 651 (citing *Derrickson v. Derrickson*, 541

15

A.2d 149, 152 (D.C. 1988); *Brown*, 486 A.2d at 49).[4]  I must apply this standard, which reflects substantive concerns about protecting the integrity of the legal profession, when deciding whether the D.C. Rules of Professional Conduct require Ms. Singer's disqualification.  *See Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 302-3 (7th Cir. 2010) (explaining that, in any case where state law provides the rule of decision, *Erie* doctrine requires federal courts to apply "ostensibly procedural rule[s] of state law...motivated by substantive concerns").

A.

The City does not dispute that Ms. Singer's role in this case constitutes the acceptance of employment on a matter that is the same or substantially related to the OxyContin Multistate Investigation.  Therefore, my analysis is limited to the third prong of Rule 1.11(a): whether Ms. Singer "participated personally and substantially" in the OxyContin Multistate Investigation during her tenure as D.C. Attorney General.[5]

---

[4] *Cf. Freeman v. Chicago Musical Instr. Co.*, 689 F.2d 715, 722 (7th Cir. 1982) (describing disqualification as "a drastic measure which courts should hesitate to impose except when absolutely necessary").

[5] I have read the parties' competing expert opinions on this question, but must reach my own conclusion based on a full review of the factual record and the case law interpreting D.C. Rule 1.11(a)'s personal and substantial participation prong.

The comments to Rule 1.11(a) do not define what constitutes personal and substantial participation in a matter, but the D.C. Court of Appeals has construed the phrase as follows:

> "Substantial participation" means that the employee's involvement must be of significance to the matter or create a reasonable appearance of such significance. *Sofaer*, 728 A.2d at 643.  A single act of approving or participating in a critical step may be substantial if the act is of significance to the matter.  *Id*. at 643. This requires more than official responsibility, knowledge, perfunctory involvement, or involvement in only administrative or peripheral issues.  *Id*. at 643.

*In re White*, 11 A.3d at 1245-46 (adopting Rule 1.11(a) analysis from D.C. Bd. on Prof'l Responsibility's report).  When construing Rule 1.11(a)'s predecessor, "the D.C. Bar Legal Ethics Committee opined that a government lawyer's participation in a matter was personal and substantial because it was 'direct, extensive, and substantive, not peripheral, clerical, or formal.'"  *In re Sofaer*, 728 A.2d at 643 (quoting D.C. Bar Op. No. 84 at 150 (1980)).

Measured against these standards, Ms. Singer's participation in the OxyContin Multistate Investigation does not amount to personal and substantial participation in that matter. Ms. Singer's involvement was limited to the following actions: receiving notice of the settlement from one of her subordinates; congratulating the attorney who led the investigation; editing her quote in a press release; and coordinating with the D.C. Mayor and D.C. Council to increase the Consumer Protection

17

Fund's statutory cap.  As between involvement that is "direct, extensive, and substantive" or only "peripheral, clerical, or formal," Ms. Singer's actions clearly fall into the latter category.  *In re Sofaer*, 728 A.2d at 643.[6]

The flip side of Ms. Singer's limited actions with respect to the OxyContin Multistate Investigation is her lack of participation at key stages of that matter.  There is no evidence that Ms. Singer played any role in directing the investigation, negotiating a settlement with the Purdue Defendants, or approving the final settlement and consent judgment.  In other words, at the critical stages of the OxyContin Multistate Investigation where a "[a] single act of approv[al] or participat[ion]" may have been enough to trigger Rule 1.11(a)'s restrictions, Ms. Singer was not involved.  *In re White*, 11 A.3d at 1245-46 (citing *In re Sofaer*, 728 A.2d at 643).

---

[6] *Cf. In re White*, 11 A.3d at 1246 (finding D.C. Rule 1.11(a) violation where former government attorney "was actively involved in dealing with [an employment discrimination complaint] after issuance of a [reasonable cause determination] and not simply in a pro forma capacity as a supervisor [of the assigned investigator]"); *In re Sofaer*, 728 A.2d at 649 (same holding where former government attorney was advised on progress of government investigation and provided legal advice and performed legal work when called upon); *U.S. v. Philip Morris Inc.*, 312 F.Supp.2d 27, 41 (D.D.C. 2004) (disqualifying former FDA attorney who spent at least 83 hours providing "advice, analysis, and review" on a matter substantially related to his subsequent representation of a private litigant).

The Purdue Defendants are advocating a reading of D.C. Rule 1.11(a) that would encompass matters falling under Ms. Singer's official responsibilities as D.C. Attorney General even when her subordinates performed all of the work. There is, however, a clearly recognized distinction in federal law between (1) personal and substantial participation in a matter and (2) official responsibility over a matter. *Compare* 18 U.S.C. § 207(a)(1) (imposing permanent restriction on certain activities relating to matters in which former federal employee "participated personally and substantially") *with* 18 U.S.C. § 207(a)(2) (imposing two-year restriction on certain activities relating to matters that were merely "pending" under former federal employee's "official responsibility[ies]").  Nothing in D.C. Rule 1.11(a), its comments, or the case law interpreting that provision suggests that the rule was intended to impose restrictions on former government attorneys who merely exercised official responsibility over subordinates.

In sum, Linda Singer did not participate personally and substantially in the OxyContin Multistate Investigation during her tenure as D.C. Attorney General.  It follows that D.C. Rule 1.11(a) does not disqualify Ms. Singer from representing the City of Chicago in this lawsuit.  Because Ms. Singer is not disqualified under D.C. Rule 1.11(a), her current law firm is not disqualified either.  *See* D.C. R. Prof'l Conduct 1.11(b)

19

("If a lawyer is required to decline or to withdraw from employment under paragraph (a) on account of a personal and substantial participation in a matter, no partner or associate of that lawyer...may knowingly accept or continue such employment except as provided in paragraphs (c) and (d) below.").

Whether the D.C. Attorney General could waive any conflict created by Ms. Singer's representation of the City in this case is irrelevant because she has not violated D.C. Rule 1.11(a). The parties' debate on this issue is entirely academic.

B.

The final issue is whether, even though Ms. Singer did not violate D.C. Rule 1.11(a), she should be disqualified because her continued representation of the City creates an appearance of impropriety.

The parties disagree over whether an appearance of impropriety--as opposed to actual impropriety--is an independent and adequate basis for disqualifying Ms. Singer.  D.C. Rule 1.11(a) "carries forward a policy of avoiding both actual impropriety and the appearance of impropriety that is expressed in the federal conflict-of-interest statutes and was expressed in the former Code of Professional Responsibility."  D.C. R. 1.11(a) cmt. 5 (emphasis added).  This commentary suggests that D.C. has adopted the appearance of impropriety standard from

20

Canon 9 of the ABA's Model Code of Professional Responsibility--
at least to the extent reflected in Rule 1.11(a) (i.e., only
when a former government attorney personally and substantially
participates in a matter). *Sofaer* strengthens this conclusion
because it defined "substantial" participation under D.C. Rule
1.11(a) to include actions that "form a basis for a reasonable
appearance" that an attorney's involvement in a matter while in
government service was significant.  728 A.2d at 643.

The question is whether Ms. Singer's actions as D.C.
Attorney General create a "reasonable appearance" that she was
personally and substantially involved in the OxyContin
Multistate Investigation.[7]  In an effort to make this showing,
the Purdue Defendants focus on Ms. Singer's public-facing
actions--namely, (1) the appearance of her name on the complaint
and consent judgment filed in D.C. Superior Court in May 2007
and (2) the D.C. Attorney General's press release announcing the
consent judgment with a quote by Ms. Singer that she personally
edited.  The complaint and consent judgment include Ms. Singer's
name in the signature block, but were signed by her designees.
The signature of a designee does not create a "reasonable

---

[7] The cases upon which the Purdue Defendants rely are inapposite
because they do not analyze whether a government attorney's
public actions with respect to a matter created a "reasonable
appearance" of personal and substantial participation.  *See*
*Kessenich v.* CFTC, 684 F.2d 88 (D.C. Cir. 1982); *Wagner v.*
*Lehman Bros. Kuhn Loeb Inc.*, 646 F.Supp. 643 (N.D. Ill. 1986);
*U.S. v. Dorfman*, 542 F.Supp. 402 (N.D. Ill. 1982).

appearance" that his or her superior was personally and substantially involved in the underlying matter.

As for Ms. Singer's quote in the press release announcing the consent judgment, it was a general statement about how the settlement related to the larger problem of marketing drugs for "off-label" uses.  Nothing in the quote creates a "reasonable appearance" that Ms. Singer was personally and substantially involved in the underlying investigation.  Indeed, the press release directs readers to contact someone other than Ms. Singer for more information, which is yet another indication that she was not directly responsible for the matter.

The Purdue Defendants are placing too much weight on a garden variety press release.  It was standard practice for the D.C. Attorney General's Office to issue a press release with a quote attributed to Ms. Singer when the office obtained a favorable outcome.  *See* Singer Declar. at ¶ 9.  This practice as followed even when, as here, Ms. Singer "had no personal knowledge of the subject matter of the press release."  *Id*. These practices are so commonplace among government agencies that a reasonable person reading the D.C. Attorney General's press releases would not assume, from the mere presence of Ms. Singer's quote, that she was personally and substantially involved in the underlying matter.

22

In sum, Ms. Singer's public actions during her tenure as D.C. Attorney General do not create a "reasonable appearance" that she was personally and substantially involved in the OxyContin Multistate Investigation.

V.

The Purdue Defendants' motion to disqualify Ms. Singer and Cohen Milstein from representing the City of Chicago in this litigation is DENIED for the reasons stated above.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: December 15, 2014