**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO, a municipal corporation, | ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 14 CV 4361 |
| v. | ) ) | |
| | ) | Judge Jorge L. Alonso |
| PURDUE PHARMA L.P., PURDUE PHARMA INC., THE PURDUE FREDERICK COMPANY INC., TEVA PHARMACEUTICALS USA INC., CEPHALON, INC., JOHNSON & JOHNSON, JANSSEN PHARMA-CEUTICALS, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., n/k/a JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC., n/k/a JANSSEN PHARMA-CEUTICALS, INC., ENDO HEALTH SOLUTIONS  INC., ENDO PHARMA-CEUTICALS, INC., ALLERGAN PLC, f/k/a ACTAVIS PLC, ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ACTAVIS LLC, and ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On May 8, 2015, the Court issued a Memorandum Opinion and Order ("May Order") [288] granting most defendants' motions to dismiss.  All that remained from plaintiff's first amended complaint were Counts I and II (consumer fraud claims) against the Purdue entities. Plaintiff filed its second amended complaint [328] in August 2015 against all defendants alleging consumer fraud, misrepresentation, false statements, false claims, insurance fraud, and unjust enrichment, and seeking cost recovery for services provided.  Plaintiff also alleges conspiracy to

defraud as to some defendants.  Defendants' motions to dismiss followed.  Currently before the Court are: (1) Cephalon, Inc. and Teva Pharmaceuticals USA, Inc.'s ("Cephalon defendants") motion to dismiss [401]; (2) Allergan plc, Actavis Inc., Actavis LLC, Actavis Pharma, Inc., and Watson Laboratories, Inc.'s ("Actavis defendants") motion to dismiss [404]; (3) Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.'s ("Endo defendants") motion to dismiss [407]; (4) Purdue Pharma L.P., Purdue Pharma Inc., and Purdue Frederick Company's ("Purdue defendants") motion to dismiss [411]; (5) Janssen Pharmaceuticals Inc. and Johnson & Johnson's ("Janssen defendants") motion to dismiss [416]; (6) defendants' joint motion to dismiss or stay under the primary jurisdiction doctrine [415]; and (7) defendants' joint motion to dismiss for failure to state a claim [423].  For the foregoing reasons, defendants' joint motion to dismiss or stay under the primary jurisdiction doctrine is denied.  The other six of defendants' motions are granted in part and denied in part.

## BACKGROUND

Plaintiff, the City of Chicago, alleges as follows.  The defendant pharmaceutical companies, through a deceptive and unfair marketing campaign, reversed the medical understanding of opioids so that prescribing opioids to treat chronic pain long-term would be commonplace.  (Second Am. Compl. ("SAC") ¶ 7.)  The City alleges that, to accomplish this goal, defendants, among other tactics, deployed sales representatives to doctors and other prescribers to deliver misleading messages about the use of opioids.  (*Id.* ¶ 8.)  These messages were designed to convince doctors that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be used safely by most patients.  (*Id.* ¶ 9.)

The Purdue defendants manufacture, promote, and distribute in Chicago, among other places, OxyContin, Butrans, and Hysingla ER. (*Id.* ¶¶ 28-29.)[1] The Cephalon defendants manufacture, sell, and distribute in Chicago, among other places, Actiq and Fentora. (*Id.* ¶¶ 34-35.)[2] The Janssen defendants manufacture, sell and distribute in Chicago, among other places, Duragesic, Nucynta, and Nucynta ER. (*Id.* ¶¶ 39-41.)[3] The Endo defendants develop, market, and sell in Chicago, among other places, Opana ER and Opana. (*Id.* ¶¶ 44-45.)[4] The Actavis defendants market and sell, in Chicago, among other places Kadian. (*Id.* ¶¶ 47-48.)[5]

Opioids have been regulated by the U.S. Drug Enforcement Administration ("DEA") since 1970 and "carry black box warnings of potential addiction," among other things. (*Id.* ¶ 58.) Studies from the 1970s and 1980s noted negative outcomes from long-term opioid therapy for pain management. (*Id.* ¶ 81.) Defendants' marketing overstated the benefits and downplayed the risks of long-term opioid therapy to expand the chronic pain market. (*Id.* ¶¶ 85-87.) Through their sales representatives and physician speakers, defendants disseminated their misrepresentations to Chicago-area prescribers, thereby generating more prescriptions and profits. (*Id.* ¶¶ 85, 88-117, 260-340, 376-89, 392-426, 476-92, 496-515, 545-79, 623-32.)

---

[1] OxyContin, Butrans, and Hysingla ER are Schedule II and III opioids first approved in 1995, 2010, and 2014 respectively and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." (SAC ¶ 29(a), (e), & (f).)

[2] Actiq and Fentora are Schedule II opioids first approved in 1998 and 2006 respectively and indicated for the "management of breakthrough cancer pain in patients 16 [and 18] years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying and persistent cancer pain." (SAC ¶ 35 (a) & (b).)

[3] Duragesic and Nucynta ER are Schedule II opioids first approved in 1990 and 2011 respectively and indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." (SAC ¶¶ 40, 41(a).) Nucynta is a schedule II opioid first approved in 2008 and used for the "relief of moderate to severe acute pain in patients 18 years of age or older." (*Id.* ¶ 41(b).) In January 2015, Depomed, Inc. acquired the rights to Nucynta and Nucynta ER from Janssen. (*Id.* ¶ 43.)

[4] Opana ER and Opana are Schedule II opioids first approved in 2006 and indicated for "the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate" and "relief of moderate to severe acute pain where the use of an opioid is appropriate" respectively. (SAC ¶ 45 (a) & (b).)

[5] Kadian is a Schedule II opioid first approved in 1996 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." (SAC ¶ 48.)

3

Defendants acted in concert with key opinion leaders and front groups to create, promote, and control the unbranded marketing of opioids to treat chronic pain, both nationally and in Chicago.  (*Id.* ¶¶ 118-213, 260, 341-75, 391, 427-75, 494, 516-44, 559, 580-622.)[6]  Defendants knowingly disseminated unbranded marketing messages that were inconsistent with information on defendants' branded marketing materials.  (*Id.* ¶ 127.)  Specifically, plaintiff asserts that each defendant and the third parties with which they conspired: (1) misrepresented that opioids improve function; (2) concealed the link between long-term use of opioids and addiction; (3) misrepresented that addiction risk can be managed; (4) masked the signs of addiction by calling them "pseudoaddiction"; (5) falsely claimed that withdrawal is easily managed; (6) omitted the greater dangers from higher doses of opioids; (7) minimized the adverse effects of opioids and overstated the risks of NSAIDs; and (8) in the case of Purdue, that OxyContin provides a full twelve hours of pain relief.  (*Id.* ¶¶ 215-59.)[7]

Because of defendants' misleading and fraudulent direct marketing, doctors prescribed opioids to treat chronic pain.  (*Id.* ¶¶ 634, 636.)  As a result, doctors and pharmacies submitted false claims for opioid prescriptions to the City's health plans that were paid for by the City as medically necessary, and the City spent over $13 million on fraudulent claims for opioid prescriptions.  (*Id.* ¶¶ 648-54, 660-62, Exs. A & B.)  The claims submitted for opioids to treat chronic pain were ineligible for payment because of defendants' deceptive and unfair conduct. (*Id.* ¶ 663.)

---

[6] "[B]randed marketing, which identifies and promotes a specific drug, must: (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks."  (SAC ¶ 119.)  Unbranded marketing does not refer to a specific drug, but generally to a type of treatment.  (*Id.* ¶ 126.)  Unbranded materials are not typically submitted to or reviewed by the FDA.  (*Id.* ¶ 127.)
[7] NSAIDs, which stands for non-steroidal anti-inflammatory drugs, such as ibuprofen, are commonly used to treat pain.  (SAC ¶ 80.)

Additionally, the City states that it has remedied all defects from the first amended complaint, with respect to each defendant, by identifying Chicago-area prescribers who received deceptive marketing messages and wrote opioid prescriptions for which the City paid, as well as specifying each defendant's editorial control over the deceptive and misleading marketing materials.  Finally, plaintiff states that its second amended complaint alleges conspiracy claims between defendants and third parties and adds an unfair practices claim.

## STANDARD

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted."  *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis omitted).  Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere

5

conclusory statements.'"  *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013)

(quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances

constituting fraud."  Fed. R. Civ. P. 9(b).  This "ordinarily requires describing the 'who, what,

when, where, and how' of the fraud, although the exact level of particularity that is required will

necessarily differ based on the facts of the case."  *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615

(7th Cir. 2011) (citation omitted); *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732,

737 (7th Cir. 2014).  Rule 9(b) applies to "all averments of fraud, not claims of fraud."

*Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).  "A claim that

'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—

can implicate Rule 9(b)'s heightened pleading requirements."  *Id.*

## DISCUSSION

### Primary Jurisdiction

### Defendants' Joint Motion to Dismiss or Stay [415]

In its May Order, the Court denied defendants' joint motion to stay or dismiss pursuant to

the primary jurisdiction doctrine.  Defendants again argue that the Court should stay or dismiss

the second amended complaint under the same doctrine because there have been interim FDA

developments and new case law, and the claims raised in the second amended complaint are

pending before, or have already been rejected by the FDA.  Plaintiff responds by arguing that the

Court has already rejected defendants' primary jurisdiction arguments and nothing has changed

in the meantime that warrants the Court's reversal.

"Primary jurisdiction is a permissive doctrine that applies when resolving a claim

'requires the resolution of issues which, under a regulatory scheme, have been placed within the

special competence of an administrative body.'" *United States ex rel. Sheet Metal Int'l Assoc.,*
*Local Union 20 v. Horning Invs., LLC,* 828 F.3d 587, 592 (7th Cir. 2016) (quoting *United States*
*v. W. Pac. Ry. Co.* 352 U.S. 59, 63-64 (1956)).  "There is no fixed formula" for applying the
doctrine and "the decision to whether to [do so] depends upon a case by case determination
whether, in view of the purposes of the statute involved, and the relevance of administrative
expertise to the issue at hand, a court ought to defer initially to the administrative agency."
*Bradford Sch. Bus Transit v. Chi. Transit Auth.,* 537 F.2d 943, 949 (7th Cir. 1976) (quotations
omitted).

As previously noted, the Court is not being asked to adjudicate whether opioids are
appropriate for the treatment of chronic, non-cancer pain or whether defendants' drugs' labels
are accurate, but whether defendants deliberately misrepresented the risks, benefits, and
superiority of opioids when marketing them to treat chronic pain, "contrary to . . . scientific
evidence and their own labels[.]"  (SAC ¶ 214.)  "Courts are equipped to adjudicate such
claims."  *City of Chi. v. Purdue Pharma L.P.,* No. 14 C 4361, 2015 WL 2208423, at *4 (N.D. Ill.
May 8, 2015); *see also, e.g., In re Horizon Organic Milk Plus DHA Omega–3 Mktg. & Sales*
*Practice Litig.,* 955 F. Supp. 2d 1311, 1349 (S.D. Fla. 2013) ("Plaintiffs' claims rest on the
determination of whether WhiteWave's brain health representations on its products' labeling, in
its advertisements, and on its website are false and/or misleading and whether customers
purchased WhiteWave's products in reliance on these representations. . . .  This is not a technical
area in which the FDA has greater technical expertise than the courts—as every day courts
decide whether conduct is misleading."); *In re Bextra & Celebrex Mktg. Sales Practices & Prod.*
*Liab. Litig.,* No. M: 05–1699 CRB, 2006 WL 2374742, at *12 (N.D. Cal. Aug. 16, 2006) ("The
issue is not whether Celebrex has fewer GI complications than other over-counter NSAIDs; the

7

FDA has already determined that it does not.  The issue is whether contrary to the FDA's findings, Pfizer nonetheless falsely claimed that Celebrex was superior.  Courts and juries frequently decide similar false advertising claims.").  Accordingly, the Court finds defendants' arguments about the FDA's ongoing investigations about the benefits and risks of using opioids to treat long-term chronic pain unpersuasive.

Defendants also cite to a state superior court case in California where a factually similar case was stayed in August 2015, not under the doctrine of primary jurisdiction, but pursuant to the court's inherent authority to manage its own cases.  In a *tentative* ruling staying the case, the court noted that the case would require the court to determine what the public and doctors need to be told about opioids and entailed much more than determining issues of false and misleading marketing.  *People v. Purdue Pharma L.P.,* 2015 WL 5123273, at *2 (Cal. Super. Ct. Aug. 27, 2015).  This non-binding ruling does not persuade the Court that a stay is warranted here.  *See Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 980 (7th Cir. 2005) ("'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'") (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).  Nothing in plaintiff's allegations, defendants' arguments, or the law has changed since the Court's May Order that merits the Court's invocation of the primary jurisdiction doctrine or a stay.  Accordingly, defendants' motion to dismiss or stay [415] is denied.

## Motions to Dismiss Under 12(b)(6)

The Court will describe the arguments in support of and in opposition to each motion before addressing them below count by count.

**Defendants' Joint Motion to Dismiss [423]**

In addition to their individual motions to dismiss, all defendants join together to assert that plaintiff has again failed to sufficiently plead fraud allegations pursuant to Fed. R. Civ. P. 8(a), 9(b), and 12(b)(6).  First, the defendants allege that plaintiff has violated Rule 9(b) by lumping all defendants together as if they were a single company manufacturing one product and by failing to plead any of its claims in the particularized manner that the rule requires. Defendants further allege that plaintiff has failed to adequately plead causation for five of the counts in its second amended complaint and also fails to allege a cognizable injury.  Defendants also argue that each of plaintiff's counts have claim-specific deficiencies.  Specifically, they argue that: Count I must be dismissed to the extent it seeks relief for fraud prior to the November 19, 2008 enactment of MCC § 2-25-090, the Chicago ordinance concerning consumer fraud; Count II must be dismissed because it does not allege facts showing the conduct to be unfair; Counts IV through VI and VIII must be dismissed because they fail to plead a false claim with any specificity and do not sufficiently allege causation; Count VII must be dismissed because it fails adequately allege causation or injury; Count IX must be dismissed because plaintiff fails to allege an agreement to violate the law or an act in furtherance of such an agreement with the required particularity; and Count X must be dismissed because plaintiff has failed to adequately allege it was harmed or that defendants caused harm.

Plaintiff responds by arguing that its second amended complaint meets Rule 9(b)'s pleading standard and adequately apprises each defendant of the claims against it.  Further, plaintiff asserts that defendants have demanded, and the Court has rejected, the application of an unrealistic particularity standard as it relates to tying misrepresentations about specific drugs made to particular prescribers and the prescriptions written in reliance on those

misrepresentations.  Plaintiff contends that defendants have the records of when their particular sales representatives met with prescribers and what was said.  Additionally, plaintiff asserts that the Court recognized in its May Order that causation and injury are not elements of the consumer fraud claims.  Moreover, plaintiff argues that whether defendants' marketing messages are misleading and therefore actionable consumer fraud is a question of fact that cannot be resolved at the motion to dismiss stage.  Plaintiff also argues that defendants' deceptive and unfair marketing caused providers to submit claims to the City for opioids prescribed for chronic pain, impliedly certifying that the prescriptions were medically necessary, eligible for coverage, and were therefore paid by plaintiff.

**Cephalon Defendants' Motion to Dismiss [401]**

In addition to the arguments set forth in the joint motion to dismiss, the Cephalon defendants argue that plaintiff's Unbranded Promotion Theory seeks to hold them responsible for lawful activities and that the Branded Promotion Theory conflates off-label promotion with fraud.[8]  Finally, the Cephalon defendants argue that plaintiff's conspiracy claim must fail because it has not asserted a claim against any third-party organization.

Plaintiff responds by arguing that is has identified eight Chicago-area prescribers who confirmed they received allegedly deceptive marketing messages from Cephalon regarding Actiq and Fentora.  Plaintiff further asserts that the marketing campaign was deceptive because it falsely implied that the drugs were FDA-approved as safe and effective for the treatment of chronic pain and minimized the risk of addiction.  Further, plaintiff argues it has alleged a sufficient basis to infer Cephalon's endorsement and control of those messages both directly and

---

[8] Unbranded Promotion Theory refers to some of the Cephalon defendants "sponsoring" third-party activities and publications that made purportedly false statements about opioid drugs in general.  (Cephalon Defs.' Mem. in support of its Mot. to Dismiss at 1.)  [402].  Branded Promotion Theory refers to plaintiff's allegations of off-label promotion.  (*Id*. at 2.)

through third parties.  Plaintiff also argues that the SAC alleges that misrepresentations were made to specific prescribers and that specific opioid prescriptions written by those prescribers, along with other facts which require the inference that defendants' deceptive messages caused false claims to be presented to and paid by the plaintiff.  Next, plaintiff argues that its allegations of conspiracy with the American Pain Foundation ("APF") are sufficient to state a claim because, among other things, Cephalon created and disseminated deceptive materials to promote the use of opioids to treat chronic pain.  Finally, plaintiff argues that it has sufficiently alleged claims for recovery for the cost of municipal services and unjust enrichment because it has identified specific prescribers who wrote City-reimbursed prescriptions as a result of defendants' deceptive conduct.

In reply, Cephalon states that plaintiff has failed to plead facts demonstrating that it made a misrepresentation or material omission in connection with any branded or unbranded promotional materials to any Chicago prescriber that caused that prescriber to write one of the prescriptions at issue.

**Actavis Defendants' Motion to Dismiss [404]**

In addition to the argument that plaintiff's complaint should be dismissed for failing to meet the pleading requirements of Rules 8(a) and 9(b), the Actavis defendants argue that (1) they are not liable for any conduct related to Kadian before January 1, 2009 because none of the defendants owned or marketed Kadian before then and (2) the Court lacks personal jurisdiction over Allergan plc and Actavis, Inc.

Plaintiff responds by arguing that its second amended complaint identifies seven Chicago-area prescribers who confirmed that they received allegedly deceptive marketing messages regarding Kadian.  Plaintiff further asserts that prescribers cannot recall when

particular visits by defendants' sales representatives occurred and that defendants are in a much better position to know those details because they track such information.  Additionally, plaintiff asserts that it does not need to plead that any physician wrote a prescription in reliance on defendants' misrepresentations because the consumer fraud claims do not require it, it has explained why defendants' misrepresentations are false, and defendants can be held liable for omitting the risk of addiction notwithstanding their drug labels.  Finally, plaintiff contends that the Court has already determined that it has personal jurisdiction over Allergan plc and Actavis, Inc. and there is no reason to revisit this ruling.

The Court will briefly address the personal jurisdiction issue.  In its May Order, the Court held that Actavis, Inc.'s predecessor, Actavis Group, tracked the number of prescriptions Illinois doctors wrote for Kadian, and ranked the doctors by the number of prescriptions they wrote. *City of Chi.*, 2015 WL 2208423, at \*6.  Additionally, there was evidence that showed that Actavis Inc.'s predecessor, Actavis Group, kept a "target list" of Illinois doctors and marketed to them.  *Id.*; *see* [254-2] and [254-5]-[254-13].  Accordingly, the Court found that these contacts were sufficient to give the Court specific jurisdiction over Actavis, Inc.  *Id.*

Actavis, Inc., submits identical declarations and makes identical arguments to those it made in the first round of motions to dismiss, save for one.  (*Compare* 1st and 2d Hirt Decls. from FAC [221-1] and [221-2] *with* 1st and 2d Hirt Decls. from SAC [405-1] and [405-2].)  Its new contention is that there are no allegations in the SAC that the entity known as "Actavis Group" is the predecessor of Actavis, Inc. or that such an entity ever existed.  However, as plaintiff points out, Sheldon V. Hirt's declaration verifies that "[o]n October 31, 2012, Watson Pharmaceuticals, Inc. completed its acquisition of the Actavis Group" and subsequently "changed its corporate name to Actavis, Inc."  (2d Hirt Decl. ¶¶ 4-5 [405-2].)  Actavis argues, in

a footnote, that the phrase "Actavis Group" is "used solely as a term of convenience to describe the group of separate and distinct corporations that were acquired by Watson Pharmaceuticals, Inc. in 2012." (Actavis Mem. in Support of Mot. to Dismiss at 22 n.27.) [405]. Nonetheless, the plain language of the declaration is more persuasive than this unsworn allegation. Absent new evidence, the Court stands by its prior ruling that specific jurisdiction exists as to Actavis, Inc.

The Court also found that there was sufficient evidence to make a prima facie case of jurisdiction as to Allergan plc when it concluded that the record suggested that Allergan plc continued the business of Actavis, Inc. *City of Chi.*, 2015 WL 2208423, at *6. Allergan plc argues, as it did previously, that Actavis Inc. is a legally distinct entity from Allergan plc. Allergan plc presents no new evidence or argument that persuades the Court to reconsider its previous ruling. Accordingly, the Court rejects the argument that it lacks jurisdiction over Allergan plc.

**Endo Defendants' Motion to Dismiss [407]**

The Endo defendants assert that plaintiff does not adequately allege a causal nexus between their alleged misconduct and any resulting injuries and that any causal chain that does exist is too attenuated to establish proximate cause. Endo also argues that plaintiff has failed to allege that any of the statements it made were fraudulent, that Endo exercised control over third-party organizations that made the alleged fraudulent statements, or that Endo conspired with a third party to commit an unlawful act.

Plaintiff responds by arguing that it cannot be decided as a matter of law that defendants' actions were or were not misleading; that is a question of fact that must be left for the jury. Further, plaintiff argues that it has identified ten Chicago-area prescribers who confirmed that

13

they received allegedly deceptive messages from Endo sales representatives regarding Opana and Opana ER.  Plaintiff also asserts that it has alleged facts that support the inference of an agreement between Endo and third parties to promote opioid therapy.

**Purdue Defendants' Motion to Dismiss [411]**

In addition to what is laid out in the defendants' joint motion to dismiss, the Purdue defendants argue that the alleged misrepresentations are not misleading as a matter of law because they comport with the labeling approved by the FDA and could not have created a plausible likelihood of deception to prescribing physicians or claims administrators and that plaintiff has not sufficiently alleged Purdue exercised control over unbranded third-party materials.  Finally, Purdue argues that plaintiff's revised allegations clarify that the two surviving claims against Purdue are now deficient as a matter of law.

Plaintiff responds by arguing that whether defendants' conduct creates a likelihood of deception is a factual question that should be left for the jury, it has sufficiently pleaded that Purdue deceptively marketed OxyContin to Chicago-area prescribers, and it has alleged that Purdue had control over third-party publications.  Plaintiff further maintains that it has sufficiently detailed Purdue's conspiracy with APF to state a claim.

**Janssen Defendants' Motion to Dismiss [416]**

The Janssen defendants argue that plaintiff fails to allege that any Chicago doctor who wrote a prescription for Duragesic or Nucynta ER that the plaintiff reimbursed was exposed to a misrepresentation about these drugs.[9]  Janssen further contends that the alleged misrepresentations are not misleading or deceptive, particularly when examined in the context of Janssen's extensive warnings about opioid-related risks, and the unbranded materials are not

---

[9] The Janssen defendants argue that Nucynta IR is not subject to the second amended complaint's attack on the use of long-acting opioids because it is an immediate-release pain reliever approved for "moderate to severe acute pain in adults."  (Janssen's Mem. in support of Mot. to Dismiss at 4.)  [418].

attributable to Janssen.  Additionally, Janssen argues that plaintiff has not alleged that Janssen entered into an agreement that would support a civil conspiracy claim.  Finally, the Janssen defendants assert that plaintiff has neither alleged wrongdoing by Johnson & Johnson nor pleaded facts sufficient for a claim of alter-ego liability.

Plaintiff asserts that it has identified eleven Chicago-area prescribers who confirmed they received one or more deceptive marketing messages from Janssen sales representatives regarding Nucynta, Nucynta ER, Duragesic, and opioids generally.  Plaintiff further argues that it has sufficiently alleged that Janssen deceptively promoted Nucynta IR for off-label chronic conditions.  Additionally, plaintiff states that Janssen's argument and supporting exhibits are premature at the motion-to-dismiss stage.  Plaintiff also contends that the allegations regarding an agreement between Janssen and a third party and the misleading nature of the resulting publication support the inference of a conspiracy by Janssen.  Finally, plaintiff asserts that it has pleaded Johnson and Johnson's liability as a principal responsible for the acts of its agent, Janssen.

The Court will briefly address Johnson & Johnson's liability.  Plaintiff has alleged that Johnson & Johnson is the only company that owns more than ten percent of Janssen Pharmaceuticals, Inc.'s stock, that it corresponds with the FDA regarding Janssen's products, and, upon information and belief, it controls the sale and development of Janssen Pharmaceuticals' drugs.  (SAC ¶ 39.)  Plaintiff also asserts that Johnson & Johnson paid prescribers to speak about Janssen's opioids at Janssen's speakers' bureau.  (SAC ¶¶ 546-47, 552(d).)

"[T]he question of whether an agency relationship existed is a question of fact that is not properly resolved on a motion to dismiss.  However, . . . a plaintiff must allege sufficient facts to

state a plausible claim that an agency relationship existed in order to survive a motion to dismiss." *Johnke v. Espinal-Quiroz,* Nos. 14-CV-6992, 14-CV-7364, 14-CV-7917, 2016 WL 454333, at *9 (N.D. Ill. Feb. 5, 2016).  If "the alleged principal has the right to control the manner and method in which work is carried out by an alleged agent and . . . the alleged agent can affect the legal relationships of the principal[,]" then an agency relationship exists. *Chemtool, Inc., v. Lubrication Techs.,* 148 F.3d 742, 745 (7th Cir. 1998).  Plaintiff's allegation that Johnson & Johnson controls the sale and development of Janssen's drugs is sufficient to create the inference that it is the principal because, if true, it demonstrates that Johnson & Johnson had control over how Janssen's work was carried out.  Further, the assertion that Johnson & Johnson paid prescribers to speak at Janssen's speakers' bureau is sufficient for the Court to infer that Janssen can affect Johnson & Johnson's legal relationships.  Accordingly, at least for purposes of a motion to dismiss, the City has alleged enough for the Court to infer that Johnson & Johnson had an agency relationship with Janssen and can therefore be held liable for Janssen's actions as alleged in the SAC.

**Count I–Deceptive Practices–All Defendants**

Plaintiff alleges that all defendants engaged in deceptive practices in violation of MCC § 2-25-090, which makes it unlawful for a business to "engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "[a]ny conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act."  (SAC ¶ 739.)[10]  Plaintiff asserts that defendants, through their control of third parties, engaged in deceptive practices when they made and

---

[10] MCC § 2-25-090(a) states: "In construing this section, consideration shall be given to court interpretations relating to the Illinois Consumer Fraud and Deceptive Business Practice Act[.]"  It further instructs that "[i]n construing this section, consideration shall also be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45."

disseminated untrue, false, and misleading statements to Chicago prescribers and consumers to promote the sale and use of opioids to treat chronic pain.  (*Id*. ¶ 742.)  Plaintiff argues that the misleading statements, listed *supra*, were disseminated through an array of marketing techniques including in-person detailing, speaker events, continuing medical education, journal articles, and advertisements.  (*Id*. ¶¶ 744-45.)[11]  Plaintiff further alleges that defendants assisted key opinion leaders and front groups develop, promote, and disseminate these misstatements.  (*Id*. ¶ 746.)

To state a claim of fraud under the Illinois Consumer Fraud Act ("ICFA"), plaintiff must allege: "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce."  *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. 2002).  Plaintiff argues that it does not have to allege injury and causation because this is an enforcement action.  *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002) ("[A]n action brought by the Attorney General under section 2 [of ICFA] . . . does not require that 'any person has in fact been misled, deceived or damaged.'") (quoting 815 ILCS 505/2).  "[U]nlike a private litigant, the Attorney General need not demonstrate that defendants' actions proximately harmed any consumers in order to establish her standing to litigate a violation of the [Illinois Consumer Fraud] Act and to seek injunctive and other relief as authorized[.]"  *People ex rel. Madigan v. United Constr. of Am. Inc.*, 981 N.E.2d 404, 411 (Ill. App. Ct. 2012).

While defendants argue that *Oliveira* and *Madigan* distinguish standing under ICFA from stating a claim under ICFA, plaintiff states that whether the issue is framed as standing or sufficiency of pleading, the cases it cites establish that causation need not be alleged in public-enforcement actions.  The Court agrees.  "A deceptive practice violates the ICFA even if it

---

[11] Detailers are sales representatives who visited physicians and their staff in their offices.  (SAC ¶ 88.)

doesn't actually deceive or injure anyone . . . and the Illinois Attorney General has the power to investigate and enjoin such a practice without a showing of actual loss." *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010).  Accordingly, the City need not allege injury or causation to state a claim under ICFA.

When a plaintiff alleges fraud under the ICFA, the heightened pleading standard of Rule 9(b) applies.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011).  Under such circumstances, a plaintiff must describe the who, what, where, when, and how of the fraud.  *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009).  In some instances, "the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Corley v. Rosewood Care Ctr., Inc.,* 142 F.3d 1041, 1051 (7th Cir. 1998); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, Nos. 14 C 1748, 14 C 8857 & MDL No. 2545, 2016 WL 4091620, at *2-4 (N.D. Ill. Aug. 2, 2016) (stating that plaintiff's allegations about defendant pharmaceutical companies' scheme as a whole suggested that an overly strict application of Rule 9(b) was inappropriate).  The Court concludes that, in this context, the plaintiff has alleged enough to meet Rule 9(b)'s particularity requirement.  In the portions of the SAC the Court discusses below, the City has identified to which Chicago-area prescribers defendants' representatives made alleged misstatements, what those alleged misstatements were, and generally when and where those alleged misrepresentations were made. The City has also asserted that specific dates and the identities of defendants' sales representatives who made the detailing visits were closely tracked by defendants and such information will be disclosed in discovery.

18

*Actavis*

Plaintiff alleges that: (1) Actavis sales representatives told Chicago prescribers that prescribing Actavis's opioids would improve their patients' ability to function and improve their quality of life; (2) Kadian sales representatives told Chicago prescribers that Kadian was less addictive, less likely to be abused, and that NSAIDs were more toxic; and (3) specific Chicago-area prescribers were "detailed" at their offices and Actavis-sponsored speaker events by Actavis representatives from 2006 to the present and were told that Kadian was difficult to abuse and less addictive.  (SAC ¶¶ 221(d), 229(c)-(e), 252(c), 281, 296(a)-(g).)[12]

*Cephalon*

Plaintiff alleges that Cephalon sales representatives: (1) told Chicago prescribers that opioids would increase patients' ability to function, improve their quality of life, and were safe even at high doses; (2) omitted discussion of addiction risks related to Cephalon's drugs in discussions with Chicago-area prescribers; (3) told Chicago prescribers that NSAIDs were more toxic than Cephalon's opioids; and (4) detailed specific Chicago prescribers about Actiq and Fentora at their offices and Cephalon-sponsored events from 2006 to the present and represented that patients could be screened to avoid addiction and that opioids would increase patients' ability to complete daily living activities.  (*Id.* ¶¶ 221(h), 229(h), 248(d), 252(e), 386(a)-(h).)[13]

---

[12] The SAC does not provide names of Actavis or Kadian sales representatives or prescribers.  Plaintiff states that each of the Chicago-area prescribers has been assigned a letter designation in the SAC and that it will disclose actual names in discovery.  (Pl.'s Resp. at 23.)  [433].  Plaintiff also states that its interviews with prescribers focused on the period of 2006 to the present, but that prescribers could not recall with precision when particular detailing visits took place.  (SAC ¶ 296 n.94.)  Plaintiff argues that defendants closely track their sales representatives' detailing visits and are in a much better position to know these dates than the City.

[13] The SAC does not provide names of Cephalon sales representatives or prescribers.  Plaintiff states that each of the Chicago-area prescribers has been assigned a letter designation in the SAC and that it will disclose actual names in discovery.  (Pl.'s Resp. at 23.)  Plaintiff gives specific dates (May 23, 2014 and June 30, 2014) for two of the detailing events.  (SAC ¶ 386(a).)  Otherwise, plaintiff reiterates its argument that interviews with prescribers focused on 2006 to the present, that prescribers could not recall with precision when particular detailing visits took place, and that defendants closely track their sales representatives' detailing visits and are in a much better position to know these dates than the City.  (*Id.* ¶¶ 296 n.94, 686.)

*Endo*

Plaintiff alleges that Endo sales representatives: (1) told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life, that Endo's drugs were less addictive, less likely to be abused, and that NSAIDs were more toxic; and (2) detailed specific Chicago prescribers about Opana and Opana ER at their offices and Endo-sponsored events from 2006 to the present and represented that Endo's opioids were less addicting than other opioids and could help patients become more physically active.  (*Id.* ¶¶ 221(n), 229(q), (s), 252(i), 392, 426, 477-80, 482(a)-(j), 488.)[14]

*Janssen*

Plaintiff alleges that Janssen sales representatives: (1) told Chicago prescribers that opioids would increase patients' ability to function and improve their quality of life, that Janssen's drugs were less addictive and less likely to be abused, that Nucynta was not an opioid, and that patients on Janssen's drugs were less susceptible to withdrawal than those on other opioids; (2) maintain a website that claims concerns about opioid addiction are overstated; and (3) detailed specific Chicago-area prescribers about Nucynta at their offices and Janssen-sponsored events from 2006 to the present and represented that Janssen's opioids would increase patients' ability to function, were less addictive, were less susceptible to withdrawal than their competitors, were an alternative to NSAIDs, and, in some instances, that Nucynta was an

---

[14] The SAC does not provide names of Endo sales representatives or prescribers.  Plaintiff states that each of the Chicago-area prescribers has been assigned a letter designation in the SAC and that it will disclose actual names in discovery.  (Pl.'s Resp. at 23.)  Plaintiff gives specific dates (April 14, 2014, May 27, 2014, and September 12, 2014) for three of the detailing events.  (SAC ¶ 482(a).)  Otherwise, plaintiff reiterates its argument that interviews with prescribers focused on 2006 to the present, that prescribers could not recall with precision when particular detailing visits took place, and that defendants closely track their sales representatives' detailing visits and are in a much better position to know these dates than the City.  (*Id.* ¶¶ 296 n.94, 686.)

alternative to opioid therapy. (*Id.* ¶¶ 221(r), 229(w), (y)-(cc), 244(d), 252(l), 549, 551, 552(a)-(k), 554, 556.)[15]

*Purdue*

Plaintiff alleges that Purdue sales representatives: (1) told Chicago prescribers that Purdue's drugs would increase patients' ability to function, were less addictive, were less likely to be abused, that the effects of withdrawal could be successfully managed, were as effective for treating patients long term, were less toxic than NSAIDs, and specifically that Butrans has a lower abuse potential than other drugs and OxyContin ER was less likely to be favored by addicts; (2) ran a website with misstatements about opioid-prescribing practices; and (3) detailed specific Chicago-area prescribers about OxyContin, Hysingla, and Butrans at their offices and Purdue-sponsored events from 2006 to the present and represented that Purdue's drugs have less potential for abuse, improve patient function, and are less addicting than other opioids. (*Id.* ¶¶ 221(x), 229(jj)-(mm), 238(d) and (g), 244(f) and (g), 248(l), 252(p), 558-59, 561, 624-29, 630(a), (c)-(i), (k)-(q).)[16]

While defendants argue that plaintiff has not alleged how the statements defendants' sales representatives made to Chicago prescribers were misleading, plaintiff contends that: opioids have been associated with the potential for abuse and addiction for hundreds of years and are

---

[15] The SAC does not provide names of Janssen sales representatives or prescribers. Plaintiff states that each of the Chicago-area prescribers has been assigned a letter designation in the SAC and that it will disclose actual names in discovery. (Pl.'s Resp. at 23.) Plaintiff gives specific dates (August 5, 2013, August 13, 2013, May 9, 2014, and July 21, 2014) for four of the detailing events. (SAC ¶ 552(a).) Otherwise, plaintiff reiterates its argument that interviews with prescribers focused on 2006 to the present, that prescribers could not recall with precision when particular detailing visits took place, and that defendants closely track their sales representatives' detailing visits and are in a much better position to know these dates than the City. (*Id.* ¶¶ 296 n.94, 686.)

[16] Purdue's website, *In the Face of Pain* (www.inthefaceofpain.com) was deactivated on October 1, 2015 (last accessed September 29, 2016). The SAC does not provide names of Purdue sales representatives or prescribers. Plaintiff states that each of the Chicago-area prescribers has been assigned a letter designation in the SAC and that it will disclose actual names in discovery. (Pl.'s Resp. at 23.) Plaintiff also states that its interviews with prescribers focused on the period of 2006 to the present, but that prescribers could not recall with precision when particular detailing visits took place. (SAC ¶ 296 n.94.) Plaintiff argues that defendants closely track their sales representatives' detailing visits and are in a much better position to know these dates than the City.

regulated by the DEA; studies of opioid use in chronic pain conditions have not demonstrated improvement in patients' function; opioids taken long term are often addictive; there is no reliable scientific study evaluating the effectiveness of opioid-addiction mitigation strategies; the effects of opioid withdrawal are difficult and can include anxiety, nausea, vomiting, headaches, insomnia, and hallucinations; and risks such as a decline in immune function, dizziness, and potentially fatal interactions with other medications are known and serious.  (*Id*. ¶¶ 56, 219, 223, 226-28, 235-36, 242-43, 249.)  Plaintiff further alleges that despite these facts about opioid use, defendants disseminated the misrepresentations discussed *supra*.

Defendants also argue that in light of the FDA-mandated product warnings that delineate the risks of opioid therapy, plaintiff has not alleged facts supporting a plausible inference of causation.  While that may be, as has already been established, plaintiff need not allege causation in order to state a claim under the ICFA.  In its May Order, the Court "reject[ed] defendants' argument that their alleged misrepresentations cannot be the basis for any fraud-based claim."  *City of Chi.*, 2015 WL 2208423, at *10.  The Court stands by that order.  *See Travelers Indem. Co. v. Cephalon, Inc.,* 32 F. Supp. 3d 538, 552 (E.D. Pa. 2014) (dismissing fraud claims when the plaintiff did *not* allege any facts in the complaint that defendant drug company misrepresented the content of the labels).  By also alleging that defendants' sales representatives made the misrepresentations to particular Chicago-area prescribers, plaintiff has sufficiently alleged intent that occurred in the course of commerce.  *See Monster Energy Co. v. Wensheng,* 136 F. Supp. 3d 897, 906 (N.D. Ill. 2015) ("[D]efendants expressly elected to do business" with Illinois residents when they created online stores that shipped throughout the United States, including to Illinois.).  Accordingly, the Court finds that plaintiff has alleged a claim for deceptive practices under the ICFA against each of the defendants.

**Count II–Unfair Practices–All Defendants**

Plaintiff also contends that defendants violated MCC § 2-25-090 when they engaged in unfair acts and practices to promote the sale and use of opioids to treat chronic pain.  (SAC ¶ 753.)  Plaintiff asserts that defendants' unfair acts include: (1) promoting opioids to the elderly and veterans to treat chronic pain in the face of known, heightened risks of opioid use to those populations; (2) engaging in untrue, false, and misleading marketing with third parties; (3) promoting advantages of opioid products in violation of FDA regulations; (4) failing to present a balance of benefit and risk information posed by opioids in violation of FDA regulations; (5) deliberately using unbranded marketing to evade FDA oversight; and (6) promoting opioids for off-label use.  (*Id*. ¶ 755.)  Plaintiff claims that defendants encouraged unfair practices by providing front groups and key opinion leaders with funding and technical support for the shared purpose of issuing unfair pro-opioid messaging.  (*Id*. ¶ 756.)  Plaintiff further alleges that defendants targeted their marketing to non-specialist physicians and non-physician prescribers who lacked the time and expertise to independently evaluate defendants' claims.  (*Id*. ¶ 758.)

In order to state a claim for unfair practices, plaintiff must allege that the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.  *Robinson,* 775 N.E.2d at 961.  All three criteria need not be present to support a finding of unfairness.  *Batson v. Live Nation Entm't, Inc.,* 746 F.3d 827, 830 (7th Cir. 2014).  Unfairness under ICFA "depends on a case-by-case analysis."  *Siegel v. Shell Oil Co.,* 612 F.3d 932, 935 (7th Cir. 2010).

A practice offends public policy when it violates a standard of conduct contained in an existing statute or common-law doctrine that typically applies to such a situation.  *Boyd v. U.S. Bank, N.A.,* 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011).  Plaintiff argues that defendants' practices

offend the policy of discouraging drug addiction in Illinois (745 ILCS 35/2), the "public policy, enshrined in state and federal law, seeking to ensure that pharmaceuticals are marketed and utilized appropriately," and the public policy against victimization of vulnerable populations for profit.  (Pl.'s Resp. at 34.)  The City asserts that even if it has failed to identify a particular statute or policy offended by the defendants' conduct, courts look to public values and broader purposes of the law and not the letter of specific provisions.  Defendants argue that the SAC only alleges a violation of the first of these policies and that the City cannot supplement its complaint through briefing.  Further, the defendants assert that 745 ILCS 35/2 is a drug-intervention statute that is irrelevant to the City's claims.[17]

The Court agrees that 745 ILCS 35/2 has no bearing on the City's claims as alleged. Additionally, while the City asserts in the SAC that the federal regulatory framework governing the marketing of specific drugs reflects a public policy designed to ensure that drug companies are responsible for providing prescribers with the information they need to accurately assess the risks and benefits of drugs for their patients, it also asks the Court to accept its inferred public policy.  Without more than an assertion that these federal statutes reflect the public policy the City infers, the Court is hesitant to affirm that such a public policy exists or is one the legislature intended.  "[T]he determination of public policy is primarily a legislative function[.]"  *Coleman v. E. Joliet Fire Prot. Dist.,* 46 N.E.3d 741, 757 (Ill. 2016).  Accordingly, the Court finds that the City has not sufficiently alleged that defendants' deceptive practices offended any public policy.

The Seventh Circuit has held that a practice is immoral, unethical, oppressive, or unscrupulous when said conduct "leaves the consumer 'little choice but to submit.'"  *Batson v. Live Nation Entm't,* No. 11 C 1226, 2013 WL 992641, at *5 (N.D. Ill. Mar. 13, 2013) (quoting

---

[17] The stated purpose of 745 ILCS 35/2 is "to promote and encourage use of the intervention process to help initiate successful treatment of alcoholism and drug addiction.  The intent of this Act is to further this goal by providing tort immunity to persons who participate in such interventions."

*Siegel*, 612 F.3d at 935).[18]   While the City presents detailed descriptions of defendants' marketing campaign, the Court does not agree that what has been alleged was so oppressive as to leave the prescriber or the consumer with limited alternatives to treat long-term pain.   Before defendants began their marketing, prescribers and consumers had long-term pain management treatment options besides opioids.   Prescribers and consumers continued to have those alternatives after defendants began marketing their drugs for long-term pain management.   While defendants' marketing campaign may have made it more likely that prescribers would opt to prescribe defendants' drugs as opposed to a non-opioid alternative, plaintiff has not alleged that no other choice existed.   Therefore, the Court finds that plaintiff has not alleged that defendants' conduct left prescribers and consumers no choice but to use defendants' opioids.

"A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers."   *G.M. Sign, Inc., v. Elm St. Chiropractic Ltd.,* 871 F. Supp. 2d 763 (N.D. Ill. 2012) (quoting *Stonecrafters, Inc., v. Foxfire Printing and Packaging, Inc.,* 633 F. Supp. 2d 610, 617 (N.D. Ill. 2009)).   While the alleged $13 million in false claims billed to the City is certainly significant, as discussed below, the Court does not find that the City has alleged enough to connect defendants' alleged deceptive marketing with prescriptions that were covered by the City.   Though the City argues that an ICFA unfair practices claim need not meet the heightened pleading standards required by Rule 9(b), the Court disagrees.   Plaintiff's amended complaint is premised on fraudulent marketing, misrepresentations, and deceptive practices which sound in fraud.   *See Camasta*, 761 F.3d at 737 (noting that adding unfairness language did not change ICFA claim "entirely grounded in fraud" to unfairness claim).   Under 9(b)'s standard, the City has not alleged enough particularities about

---

[18] In the SAC, the City alleges that defendants' conduct was oppressive, not immoral, unethical, or unscrupulous. (SAC ¶ 758.)

injuries to consumers or that those injuries or the monetary damage the City incurred were caused by prescriptions written as a result of defendants' alleged deceptive marketing.

Accordingly, the City's unfair practices claim is dismissed without prejudice. Because this is the first time the City has alleged a separate claim for unfair practices and because plaintiff is being given a final opportunity to amend several other counts, it is also given leave to amend its claim for unfair practices if it so chooses.

**Count III–Misrepresentation–All Defendants**

Plaintiff next claims that defendants violated MCC § 4-276-470(1), which makes it illegal to use deception, fraud, false pretense, or misrepresentation with the intent that others rely on such concealment, in connection with the sale or advertisement of any merchandise. (SAC ¶ 762.) Plaintiff further alleges that directly and through their control of third parties, defendants knowingly made and disseminated deceptions and misrepresentations to promote the sale and use of opioids to treat chronic pain. (*Id*. ¶¶ 765-66.) Additionally, plaintiff asserts that defendants engaged in fraudulent behavior by acting in concert with third-party front groups and key opinion leaders to make false statements about the use of opioids in treating chronic pain. (*Id*. ¶ 768.)

Defendants seem to rely on the arguments that plaintiff has not met the heightened pleading requirements of Rule 9(b) and that it has failed to distinguish each defendant's actions so as to put each defendant on notice of the claims against it. Like the City's claim for deceptive practices under the ICFA, MCC § 4-276-470(1) does not require that "any person has in fact be misled" in order to state a claim. Accordingly, plaintiff need not allege causation or injury to allege a claim for misrepresentation. As discussed in detail above, the Court has found that plaintiff has alleged, with enough particularity to meet Rule 9(b)'s requirements,

26

misrepresentations that each defendant made to Chicago-area prescribers about their particular opioids.  Accordingly, the Court finds that plaintiff has stated a claim for misrepresentation against each defendant.

**Counts IV and V–False Statements and False Claims–All Defendants**

Plaintiff next asserts that defendants violated Chicago's False Statement Act and False Claims Act, MCC §§ 1-21-010 and 1-22-020, when, through their deceptive marketing of opioids for chronic pain, they knowingly caused prescribers to make false statements to the City so as to obtain plaintiff's approval and payment of fraudulent claims.  (SAC ¶¶ 776, 786.) Plaintiff alleges that defendants, through their deceptive marketing about opioids, caused doctors and pharmacists, via prescriptions, to falsely submit to the City's health plans and workers' compensation program claims that opioids were medically necessary and reasonably required to treat chronic pain.  (*Id.* ¶¶ 776-77, 788.)  Plaintiff argues that defendants knew or should have known that as a result of this fraud, the City would pay for long-term prescriptions of opioids to treat chronic pain and that it has been damaged and continues to be damaged as a result of paying for such prescriptions.  (*Id.* ¶¶ 781, 789.)

Section 1-21-010 prohibits any person from "knowingly mak[ing] a false statement of material fact to the city in violation of any statute, ordinance or regulation, or . . . knowingly mak[ing] a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation[.]"  According to § 1-21-010(d):

> [A] person knowingly makes a false statement of material fact when that person (i) makes a statement of material fact with actual knowledge that the statement was false, or (ii) makes a statement of material fact with knowledge of facts or information that would cause a reasonable person to be aware that the statement was false when it was made, or (iii) signs, certifies, attest, submits or otherwise provides assurances, or causes any other person to sign, certify, attest, submit or otherwise provide assurances, that a statement of material fact is true or accurate in deliberate ignorance or reckless disregard of the truth or falsity of the

> statement.  For purposes of this section, a person who fails to make a reasonable investigation to determine the accuracy, truthfulness or completeness of any material fact acts in deliberate ignorance or reckless disregard of the truth or falsity of the material fact.

In relevant part, § 1-22-020 imposes liability on any person who:

> (1) knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city[.]

Accordingly, plaintiff must allege that defendants knowingly caused a false statement of material fact to be made to the City and knowingly caused a false claim to be presented for payment by the City. *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 656 (N.D. Ill. 2015).[19]

First, defendants argue that the City has failed to plead that specific false statements and false claims exist because it generally asserts that all reimbursement claims for all opioids prescribed to treat chronic non-cancer pain are false.  Defendants contend that the SAC does not allege express false certification of claims and improperly alleges that every opioid reimbursement claim falsely includes the prescriber's implied certification that the prescription is medically necessary and consistent with generally accepted medical standards.  The City responds by arguing that prescribers falsely and expressly certified that opioid therapy was medically necessary when they submitted CMS Form 1500 for prescription and office visit reimbursement.[20]  Alternatively, the City argues that defendants' misrepresentations caused prescribers to impliedly certify that opioid prescriptions for chronic pain were medically

---

[19] Courts have held that False Claims Act ("FCA") case law is applicable to state false claims cases. *Mason v. Medline Indus.*, No. 07 C 5615, 2009 WL 1438096, at *8 (N.D. Ill. May 29, 2009).  Accordingly, the Court applies FCA case law to the municipal false claim counts. *See City of Chi. ex rel. Rosenberg v. Redflex Traffic Sys.*, No. 15 C 8271, 2016 WL 4203835, at *16 (N.D. Ill. Aug. 8, 2016) (noting that the City's False Statement ordinance does not have a parallel in the FCA).

[20] The SAC does not discuss or refer to CMS Form 1500.  The City's response includes a website link to a blank CMS Form 1500, which, in part, reads: "In submitting this claim for payment for federal funds, I certify that . . . 5) the services on this form were medically necessary and personally furnished by me . . . ."

necessary.  Because the City's health and workers' compensation plans require treatment to be medically necessary in order for the City to provide coverage, plaintiff argues that submission of claims for payment by the City was false on its face.  Further, the City argues that it has sufficiently pleaded a claim for false claims—notwithstanding express or implied certification—because the prescriptions were not medically necessary and were therefore ineligible for reimbursement.

Courts have held that the scope of the FCA is not limited to factual allegations that fit within the judicially-created categories of promissory fraud or false certification.  *See, e.g., U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1036 (C.D. Cal. 2012).  In this case, however, plaintiff has alleged that defendants' misrepresentations caused prescribers to falsely *certify* that prescriptions for opioids to treat chronic pain were medically necessary and that such false *certification* resulted in the submission of false claims to the City for reimbursement.  (SAC ¶¶ 650-51, 653-55, 667.)  This is an instance where plaintiff has alleged that a false-certification theory of liability applies.  While plaintiff argues that it has pleaded express certification, the Court does not agree.  Nowhere in the SAC does the City assert that it received or relied upon completed versions of CMS Form 1500, which requires doctors to certify that the services documented therein are medically necessary, when it distributed reimbursements.  Therefore, the Court finds that plaintiff has failed to adequately allege a municipal false claims act claim under a theory of express false certification.  *See United States v. Nuwave Monitoring, LLC,* No. 12 C 69, 2016 WL 750155, at *6 (N.D. Ill. Jan. 26, 2016) (dismissing an FCA claim, in part, for relying on factual allegations about the use of CMS Form 1500 not contained in the SAC).

Alternatively, the City argues that it has alleged that false claims exist under a theory of implied false certification.  While defendants argue that the Seventh Circuit has rejected the

theory of implied certification, a recent Supreme Court decision is instructive on this point.  In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016), the Court held that an "implied certification theory can be a basis for liability[.]"  In so holding, the Court abrogated *United States v. Sanford-Brown, Ltd.,* 788 F.3d 696 (7th Cir. 2015), which rejected the doctrine of implied false certification and is the case on which defendants rely.  In light of the Supreme Court's ruling in *Universal Health,* the City can proceed under a theory of implied false certification.

Importantly, *Universal Health* also instructed that when alleging liability a theory of false certification is alleged, "the misrepresentation must be material to the other party's course of action" in order to be actionable under the FCA.  136 S. Ct. at 2001.  The Court went on to state that "[t]he materiality standard is demanding. . . . [and that a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  *Id.* at 2003.  Finally, the Court noted that "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  *Id.* at 2003-04.

In the SAC, the City alleges that defendants' misrepresentations were material because if the City had known of the false statements, it would have refused to authorize payment for opioid prescriptions to treat chronic pain.  (SAC ¶ 790.)  The City further alleges that it "paid and continues to pay the claims that would not be paid but for defendants' illegal business practices." (*Id.* ¶ 794.)  In supplemental briefing, defendants argue that the City's statement that it continues

30

to pay false claims undermines the assertion that the misrepresentations were material under *Universal Health*.  In response, the City argues that it has a practice of not paying claims it actually knows are unnecessary, and since the lawsuit was filed, the City has taken additional steps to constrain payments for unnecessary prescriptions of opioids to treat chronic pain.  While that may be, it contradicts the allegations the City makes in the SAC.  Based on the allegations therein, the City represents that is still paying for claims based on defendants' alleged misrepresentations.  The City argues that it was unaware that claims were false when it paid them, but the Court has difficulty understanding how the City remained unaware that the claims were false after the lawsuit was filed.  Accordingly, the Court finds that plaintiff has not sufficiently alleged that defendants caused misrepresentations that were material as defined in *Universal Health* and therefore has not stated a claim for false statements or false claims.

Because *Universal Health's* holdings on implied false certification and materiality were not available at the time the SAC was filed or before primary briefs on the motions to dismiss were filed, Counts IV and V are dismissed without prejudice.  The City is given a final opportunity to replead the claims for false statements and false claims.  *See United States ex rel. Dresser v. Qualium Corp.,* Case No. 5:12-cv-01745-BLF, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) (granting leave to amend implied false certification claims based on *Universal Health*).

Next, defendants argue that the City has not met Rule 9(b)'s particularity requirement in alleging that false claims were presented for payment.  The Court disagrees and finds that plaintiff has met Rule 9(b)'s heightened pleading standard.  In Exhibits A and B to the SAC, the City provides specific patients whose claims were submitted for reimbursement, when and where each prescription was filled, which drug was dispersed, the dose, and the quantity prescribed, as

well as how much the City was billed for each prescription. This is sufficient. *See Shmushkovich v. Home Bound Healthcare, Inc.,* 12 C 2924, 2015 WL 7251934, at * 6 (N.D. Ill. Nov. 17, 2015) ("Of course on summary judgment the plaintiff will have to show some evidence that a false claim was actually submitted. But that is not the law at the pleading stage.").

Finally, defendants argue that plaintiff has failed to allege that their misrepresentations were the proximate cause of the false statements and false claims because (1) plaintiff does not assert that the prescribers who heard defendants' misrepresentations are the same doctors who prescribed defendants' drugs and (2) the connection between the alleged misrepresentations and the City's injury is too attenuated. In exhibits to the SAC, plaintiff includes charts listing prescribers by name who prescribed defendants' drugs, which drugs were prescribed, the patient for whom the prescription was written, when the prescriptions were filled, and how much the City was billed. (SAC Exs. A & B.) In these exhibits, plaintiff identifies prescribers by actual name, whereas in the SAC, prescribers who heard the misrepresentations from defendants' representatives are identified by letter. (See SAC ¶¶ 296(a)-(h), 386(a)-(h), 482(a)-(j), 552(a)-(k), 630(a)-(q).) Because of these different identification systems, it is impossible for defendants or the Court to determine if the prescribers who prescribed defendants' drugs that the City reimbursed are the same prescribers who heard the misrepresentations about defendants' drugs.[21] Because the Court has already dismissed these two claims, if the City chooses to replead them, it is directed to file an additional exhibit wherein the prescribers' names are linked to the letter designation used to identify prescribers in the SAC.

If the prescribers who heard the misrepresentations are clearly identified as the same prescribers who subsequently prescribed defendants' drugs, in order to state claims for false

---

[21] Plaintiff states that it will link letter designations to specific names in discovery or by Court order. (Pl.'s Resp. at 106 n.83.)

statements and false claims, the City still must adequately allege that those prescribers relied on defendants' misrepresentations when they prescribed defendants' drugs.  Plaintiff alleges that such reliance is evidenced by: (1) the City's increased spending on opioids; (2) interviews with Chicago prescribers who prescribed opioids paid for by the City and confirmed that they prescribed opioids based on deceptive marketing and patients' demand; and (3) a sample of claims for opioids that were prescribed by physicians who were subject to defendants' deceptive marketing and paid for by the City's health plans and workers' compensation program.  (SAC ¶¶ 634, 644-95.)  Plaintiff further contends that defendants' assertion that the City must allege which misrepresentations caused specific prescriptions misapprehends the City's claims and that such a level of specificity is not required to plead false statement and false claims causation. Finally, plaintiff argues that defendants' deceptive marketing campaign altered prescribers' perceptions of the suitability of using opioids to treat chronic pain and that it has sufficiently pleaded facts giving rise to the inference that prescribers prescribed opioids for chronic pain as a result of defendants' deceptive marketing.

Defendants respond by arguing that the following are intervening events that break the causal chain: (1) the prescriber's independent medical judgment; (2) the patient's preferences; (3) the patient's decision to fill a prescription; (4) the patient's decision whether and how to use the medication; and (5) the City's decision to cover and reimburse the prescriptions.  Plaintiff argues that to demonstrate but-for causation, it only needs to show that the false statements and claims were the reasonably foreseeable consequences of defendants' deceptive marketing. Defendants reply, that plaintiff concedes that the SAC fails to make a causal connection between misrepresentations and specific prescriptions and that there is no basis to infer any causal connection between doctors' prescriptions and defendants' alleged misrepresentations.

Defendants improperly rely on RICO case law.  To determine causation in the RICO context, the focus is on the directness of the relationship between the conduct and the harm; foreseeability does not play a role.  *Sidney Hilman Health Ctr. of Rochester v. Abbott,* No. 13 C 5865, 2016 WL 3538808, at *5 (N.D. Ill. June 29, 2016).  In *Sidney*, the court held that because a drug company's misrepresentations were made to prescribing physicians and not the third-party payors themselves, the chain of causation was interrupted by the physician's independent medical judgment, the patient's decision making, and the decision-making process of the third-party payor.  *Id.* at *5-6.

However, in the FCA context, "[c]ourts borrow general tort law principles to analyze the FCA's causation element."  *U.S. ex rel. Brown v. Celgene Corp.,* No. CV 10-3165-GHK (SSx), 2014 WL 3605896, at *8 (C.D. Ca. July 10, 2014).  "Under the FCA, a defendant is answerable for 'the natural, ordinary and reasonable consequences of his conduct[.]'"  *U.S. ex rel. Kennedy v. Aventis Pharm., Inc.,* 610 F. Supp. 2d 938, 943-44 (N.D. Ill. 2009) (quoting *Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662 (2008)).  The Seventh Circuit has held that many intervening events "are not so unforeseeable as to break the chain of causation."  *United States ex rel. Watson v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013).  In *Watson*, the court held that intervening events such as filling the prescription at the pharmacy were "eminently foreseeable forces" and that expert testimony was not required for a jury to understand that "writing a prescription to a person insured by Medicaid will likely cause a claim to be filed with Medicaid."  *Id.* at 715.  In *Brown,* the court denied the motion to dismiss and held that there was a plausible inference of proximate and but-for causation between the defendant drug company's conduct and the submission of false claims.  2014 WL 3605896, at *8.[22]  Similarly, in *Kennedy*,

---

[22] The court in *Brown* held that the causal chain was straightforward: (1) defendant drug company fraudulently promoted its drugs for non-reimbursable, off-label uses to physicians; (2) the off-label marketing caused physicians

the court denied the motion to dismiss, holding that "later, intervening factors," including the hospital's decision to incorporate non-reimbursable charges for off-label prescriptions on its cost reports, did "not break the chain of causation as a matter of law."  610 F. Supp. 938 at 944.

Given that plaintiff brings its case, in part, under Chicago's False Claims Act, the Court applies the foreseeability standard rather than the direct relationship standard required for RICO claims.  As other courts in this circuit have held, the Court finds that the alleged false statements made by prescribers that resulted in the City's payment of false claims were foreseeable consequences of the alleged misrepresentations defendants' representatives made to Chicago-area prescribers.  If the City connects the named prescribers listed in Exhibits A and B to prescribers identified by letter in the SAC who were detailed with defendants' alleged deceptive marketing, the Court would likely find that plaintiff has adequately alleged causation.

**Counts VI and IX–Conspiracy to Defraud and Civil Conspiracy–Cephalon, Endo, Janssen, and Purdue**

Plaintiff next claims that some defendants also violated Chicago's False Claims Act, MCC § 1-22-020, and engaged in a civil conspiracy when they conspired with front groups and key opinion leaders to defraud plaintiff by getting false claims allowed or paid.  (SAC ¶ 800.) Plaintiff further alleges that defendants knowingly collaborated with the front groups and key opinion leaders in unfair and deceptive practices—namely, making and disseminating false and misleading statements to prescribers and consumers—to promote the use of opioids to treat chronic pain.  (*Id.* ¶ 801.)  Plaintiff alleges that defendants Cephalon, Endo, Janssen, and Purdue agreed with front groups, specifically the APF, to deceptively promote the risks and benefits of opioid therapy by creating and disseminating publications that contained such misrepresentations.  (*Id.* ¶¶ 802-05, 838-41.)  Plaintiff further alleges that certain publications—

---

to write off-label prescriptions; and (3) many of the non-reimbursable prescriptions were submitted to government payors for reimbursement.  2014 WL 3605896, at *8.

*Treatment Options: A Guide for People Living with Pain* (Cephalon & APF), *Exit Wounds* (Endo & APF), *Let's Talk Pain* (Janssen & APF), and *A Policymaker's Guide to Understanding Pain & Its Management* (Purdue & APF)—were the products of these conspiracies and evidence of each conspiracy's existence. (*Id.*)

Plaintiff asserts in Count VI that because of these conspiracies, prescribers wrote prescriptions for opioids to treat chronic pain, which were submitted to plaintiff's health plans and workers' compensation program for payment. (*Id.* ¶ 807.) Plaintiff argues that defendants and their co-conspirators knew or should have known that as a result of this conspiracy, plaintiff would pay for long-term prescriptions of opioids to treat chronic pain. (*Id.* ¶ 808.) In Count IX, plaintiff alleges that defendants' conspiracy to deceptively market opioids caused doctors to prescribe, and the City to pay for, opioid prescriptions for chronic pain and long-term opioid treatment. (*Id.* ¶¶ 845-46.)

*Count VI–Conspiracy to Defraud Under the City's False Claims Act*

MCC § 1-22-020 imposes liability on any person who conspired to defraud the City by getting a false claim allowed or paid. In order to state a claim, the City must allege that the conspirators had an agreement to defraud the government by getting a false claim paid and that the conspirators did so for the purpose of obtaining payment from the government. *See Singer v. Progressive Care, SC,* No. 11-CV-2679, 2016 WL 4245503, at *7 (N.D. Ill. Aug. 11, 2016). In part, defendants argue that because the City has failed to allege an underlying false claim, the City's conspiracy claim fails as well. The Court agrees. Because plaintiff's false-claim count has been dismissed, a subsequent claim that relies on a false claim cannot survive. Accordingly, Count VI is dismissed without prejudice. *See United States ex rel. Rockey v. Ear Inst. of Chi., LLC,* 92 F. Supp. 3d 804, 826 (N.D. Ill. 2015) (dismissing FCA conspiracy claim because the *qui*

*tam* claims were dismissed). If plaintiff repleads its false-claim count, it need not replead Count VI and may rely on its municipal false claim conspiracy allegations.

*Count IX–Civil Conspiracy*

To state a claim for civil conspiracy, the City must allege facts that establish "an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means and at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff." *Borsellino*, 477 F.3d at 509. Defendants argue that plaintiff has failed to allege an agreement to commit an unlawful act or a tortious act in furtherance of such an agreement. Further, defendants argue that plaintiff has failed to allege a conspiracy with enough particularity to satisfy Rule 9(b). Plaintiff responds that it has pleaded sufficient facts, including that defendants helped fund APF and in some cases had written agreements memorializing their collaboration, to support an inference of an agreement between each defendant and APF. (SAC ¶¶ 186, 189-91, 433, 436-37, 533-41, 589-90, 594.) Plaintiff also asserts that defendants acted in furtherance of the agreement by creating and disseminating false and misleading publications to prescribers and consumers.

Causation is one of the elements of civil conspiracy. *Hess v. Kanoski & Assocs.,* 668 F.3d 446, 456 (7th Cir. 2012). Plaintiff has failed to adequately allege that the prescribers who received defendants' deceptive publications are the same prescribers who wrote prescriptions for defendants' drugs that the City paid. Accordingly, the City has not alleged that its injury—the cost of covering prescriptions for defendants' drugs—was caused by defendants' alleged conspiracy. Count IX is dismissed without prejudice. The City is given a final opportunity to replead this claim by submitting an exhibit that connects prescribers, who received defendants' deceptive publications, identified by letter in the SAC, with prescribers, who wrote prescriptions

for defendants' drugs for which the City subsequently paid, identified by name in Exhibits A and B.

**Count VII–Recovery of City Costs–All Defendants**

Plaintiff contends in Count VII that defendants violated MCC § 1-20-020 when they participated in the unlawful acts alleged in Counts I through VI causing plaintiff to incur costs, and are liable for those costs.  (SAC ¶¶ 818-19.)  Defendants argue that such a municipal-services claim requires causation, which plaintiff has not adequately alleged, and that the claim is barred by the remoteness doctrine.  Plaintiff argues that the municipal services claim does not require the City to prove defendants violated the false claims ordinance and can be predicated on the City's consumer fraud ordinance and damages that are reasonably related to that violation. The City alleges that those costs include prescriptions, addiction-treatment services, hospitalizations, and emergency services.  Plaintiff also contends that the doctrines defendants invoke have no bearing here.

To state a claim for recovery of costs, plaintiff must allege that defendants "*cause[d]* the city . . . to incur costs in order to provide services reasonably related to . . . [defendants'] violation of any federal, state or local law."  MCC § 1-20-020.  As discussed above, the City has failed to identify the prescribers who were exposed to defendants' misrepresentations as the same prescribers who prescribed defendants' drugs and thereby caused the City to incur costs. Without this link, plaintiff has not adequately alleged that defendants caused the City to incur costs.  Accordingly, Count VII is dismissed without prejudice.  As indicated above, plaintiff is given a final opportunity to replead Count VII by submitting an exhibit that links prescribers in the SAC who were detailed with defendants' deceptive marketing messages with prescribers listed in Exhibits A and B who actually prescribed defendants' opioids for which the City paid.

38

**Count VIII–Insurance Fraud–All Defendants**

Plaintiff alleges in Count VIII that defendants violated 720 ILCS § 5/17-10.5(a)(1) and committed insurance fraud when they knowingly caused false claims to be made to plaintiff's health plans and workers' compensation program, which resulted in payments for those false claims. (SAC ¶¶ 827, 829.) In relevant part, "[a] person commits insurance fraud when he or she knowingly obtains . . . or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity . . . by causing a false claim to be made on any policy of insurance issued by an insurance company or . . . self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property." 720 ILCS § 5/17-10.5(a)(1). Because the Court has dismissed the false claim count, the Court must also dismiss this count. Without an underlying false claim, a claim for insurance fraud premised on a false claim fails. *See United States ex rel. Sibley v. A Plus Physicians Billing Serv. Inc.,* 13 C 7733, 2015 WL 8780548, at *3 (N.D. Ill. Dec. 15, 2015) (dismissing insurance fraud claim when FCA claim was dismissed). Accordingly, Count VIII is dismissed without prejudice. If plaintiff repleads its false claim count, it need not replead Count VIII and may rely on its insurance fraud allegations.

**Count X–Unjust Enrichment–All Defendants**

Finally, plaintiff alleges that defendants have unjustly retained a benefit to plaintiff's detriment by deceptively promoting opioids to treat chronic pain, which resulted in the City making payments for prescriptions. (SAC ¶ 849.) Plaintiff further alleges that defendants' retention of that benefit violates the fundamental principles of justice, equity, and good conscience. (SAC ¶ 848.) The City can recover on a theory of unjust enrichment if the defendant has unjustly retained a benefit to the plaintiff's detriment, and defendant's retention of

the benefit violates the fundamental principles of justice, equity, and good conscience.  *Cleary v. Philip Morris Inc.,* 656 F.3d 511, 516 (7th Cir. 2011).

Defendants argue that the unjust enrichment claim fails because it rests on other deficient claims.  They further assert that the City has not adequately alleged that it was harmed or that defendants caused any such harm.  Plaintiff argues that it has remedied the deficiencies of the first amended complaint by providing details of sample claims paid by the City for patients who were prescribed defendants' drugs by prescribers who confirmed they had received defendants' deceptive marketing messages.  Further, plaintiff argues that even if its false-claims counts fail, the improper conduct underlying those claims still supports an unjust enrichment claim.

The same "missing link" issue that the Court has discussed is dispositive here.  Plaintiff has identified prescribers in the SAC by letter and by name in Exhibits A and B.  Accordingly, it is impossible for the Court or the defendants to decipher whether the prescribers who heard defendants' deceptive messages are the same individuals who prescribed defendants' drugs that were subsequently paid for by the City and therefore that defendants' misrepresentations resulted in defendants' enrichment.[23]  Accordingly, Count X is dismissed without prejudice.  As indicated above, plaintiff is given a final opportunity to replead Count X by submitting an exhibit that supplies the missing link.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss or stay [415] is denied. Defendants' motions to dismiss [401], [404], [407], [411], [416], [423] are granted in part and

---

[23] Plaintiff correctly points out that an unjust enrichment claim can survive a motion to dismiss when an ICFA claim is also adequately pleaded.  *See DeFalco v. Vibram USA, Inc.,* No. 12 C 7238, 2013 WL 1122825, at *8 (N.D. Ill. Mar. 18, 2013).  However, because plaintiff need not allege causation for its consumer fraud claims, the Court did not discuss causation when it analyzed Counts I through III.  If the Court had been required to conduct such analysis, it likely would have identified the same missing link.  Without documentation that prescribers who heard defendants' alleged misrepresentations are the same prescribers who prescribed defendants' opioids for which the City paid, plaintiff has not adequately alleged that the defendants were unjustly enriched as a result of their misrepresentations.

denied in part.  Counts II and IV through X are dismissed without prejudice.  Plaintiff is given a final opportunity, until October 31, 2016, to replead those counts as directed herein.

**SO ORDERED.**                              **ENTERED: September 29, 2016**

_____

**JORGE L. ALONSO**
**United States District Judge**